IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUSAN HYER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 15-297-GMS |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Angela Pinto Ross, Esquire, of Pasquale, Krawitz, Siegel & Bhaya, Wilmington, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney and Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Nora Koch, Acting Regional Chief Counsel and M. Jared Littman, Assistant Regional Counsel, Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

**SLEET, District Judge**

## I.   INTRODUCTION

Plaintiff Susan Hyer ("Hyer") appeals from a decision of defendant Carolyn W. Colvin, Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits and supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-434 and 1381–1383f. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently before the court are the parties' cross-motions for summary judgment. (D.I. 11, 13). For the following reasons, Hyer's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

## II.   BACKGROUND

### A.   Procedural History

On March 19, 2009, Hyer filed an application for disability insurance benefits, alleging disability beginning January 2, 2009. (D.I. 14 at 1). Administrative Law Judge ("ALJ") Melvin Benitz issued a decision on November 8, 2010, finding that Hyer was not disabled. (Tr. 102-12). Hyer eventually appealed that decision to the United States District Court for the District of Delaware. On October 28, 2014, Judge Robinson affirmed the ALJ's decision that Hyer was not disabled from January 2, 2009 to November 8, 2010. *Hyer v. Colvin*, 72 F. Supp. 3d 479 (D. Del. 2014).

In the meantime, on March 17, 2011 and March 22, 2011, Hyer filed subsequent applications for disability insurance benefits and supplemental security income. (Tr. 237-53). Hyer again alleged a disability onset date of January 2, 2009 (Tr. 237), but *res judicata* bars review of the period previously adjudicated by ALJ Benitez. *See* 20 C.F.R. §§ 404.1527(c)(1),

1

416.957(c)(1); Acquiescence Ruling 00-1(4), 2000 WL 43774 (concluding that subsequent applications are considered only with respect to the period that was not previously adjudicated).

Hyer's March 2011 claims were denied at the initial and reconsideration levels of review. (Tr. 189-200). Hyer requested an administrative hearing, which was held before ALJ Showalter on August 14, 2013. (Tr. 53-98). On August 27, 2013, ALJ Showalter issued a decision finding that Hyer was not disabled from November 9, 2010 to August 27, 2013. (Tr. 27-40). The Appeals Council denied Hyer's request for review, making ALJ Showalter's decision the Commissioner's final decision. (Tr. 1-3). Having exhausted her administrative remedies, Hyer brought this action for judicial review.

### B.    Education and Work Experience

Hyer was born in 1963 and was 49 years old on the date of the administrative hearing. (D.I. 14 at 3). She has a high school diploma and took one semester of college. (Tr. 490). Hyer never required special education. (*Id.*). She worked as a receptionist for a law firm from 1990 to June 1999, an administrative support assistant at an insurance firm from June 1999 to January 2007, and a customer service representative at a pest control company from July 2007 to January 2, 2009. (Tr. 275, 339). All of her past jobs were sedentary and semi-skilled. (Tr. 94).

### C.    Medical History

In her March 2011 applications, Hyer alleged disability due to bipolar disorder, major depression, arthritis, migraines, and a weak immune system. (Tr. 118). The ALJ found that Hyer had the severe impairments of obesity, depression, and anxiety, and no other severe impairments. (Tr. 30). Hyer does not challenge the ALJ's findings with respect to her physical impairments, only her mental impairments. (D.I. 12 at 10-21). Following are the facts from Hyer's medical history that are relevant to the issues on appeal.

2

Hyer has been receiving mental health treatment from Joan Chatterton, RN, LCSW since 2008 and from psychiatrist David Kalkstein, MD since 2010. (D.I. 12 at 4). In the beginning, Hyer lived with her fiancé in a condominium that her father had bought for her. (Tr. 451, 490). She also had an adult daughter from which she was estranged. (Tr. 451). Dr. Kalkstein prescribed various medications for Hyer and monitored their effects. (*See, e.g.*, Tr. 443-51). Hyer described these visits as "once per month medication checks." (Tr. 492).

In December 2010, Hyer was worried about the holidays and her adult daughter. (Tr. 356) Chatterton noted that Hyer frequently canceled appointments and was vague about her numerous somatic complaints. (Tr. 356). Chatterton "strongly" encouraged Hyer to attend therapy weekly sessions. (*Id.*). In January 2011, Hyer had increased depression symptoms and difficulty getting out of bed. (*Id.*). Hyer continued to cancel "numerous" sessions. (*Id.*). On February 19, 2011, Hyer told Chatterton that she felt depressed and unmotivated. (*Id.*). On February 24, 2011, however, Hyer told Dr. Kalkstein that she was "not depressed." (Tr. 446).

On March 7, 2011, Hyer went to Christiana Care with her fiancé, because she had thoughts of removing the bird netting from her balcony and jumping. (Tr. 359, 367). She had no prior suicide attempts and no prior inpatient treatment for psychiatric care. (Tr. 381). Hyer told Christiana Care she was "rapid cycling bipolar but had never had an actual manic episode." (Tr. 381). Hyer was "discouraged regarding family issues." (Tr. 359). Her daughter was going to rehab, and she recently found out that her daughter had been abused by her second husband. (*Id.*). The admission notes also recorded Hyer's remarks regarding financial stresses.[1] (Tr. 34, 359). Finally, Hyer reported that her fiancé had been very supportive; they had been together for 2-1/2

---

[1]     Hyer told Christiana Care that she had been turned down for disability insurance benefits three times and was trying to appeal to a new court and judge. (Tr. 359, 381).

years; and she has "a couple of close friends who live locally and several other friends who are out of state." (Tr. 359). Following group therapy sessions and medication changes, Hyer was feeling much better, denied suicidal thoughts, and was feeling confident about her ability to improve. (Tr. 382). After five days, Hyer was discharged. (Tr. 69, 381). A few days after discharge, Hyer told Dr. Kalkstein that she was feeling better. (Tr. 445).

Sometime in early spring of 2011, Hyer visited her father in North Carolina. (Tr. 444). Then, on April 7, 2011, Hyer had an appointment with Chatterton after an absence of six weeks. (Tr. 356). In that session, Hyer reported that she had not attended the outpatient group therapy recommended by Christiana Care. (Tr. 355). Hyer had told Christiana Care that she would instead increase the frequency of her visits with Dr. Kalstein and Chatterton.[2] (Tr. 381). Because Hyer had not kept her previous appointments, Chatterton reiterated the importance of consistent attendance at therapy. (Tr. 355). Meanwhile, Hyer reported improved sleep and that medicine changes appeared to be stabilizing her mood. (*Id.*). On April 21, 2011, Hyer similarly reported to Dr. Kalkstein that she had no mood swings and no medication side effects. (Tr. 465). Hyer continued to report in May and June 2011 that she had no problems with mood swings. (Tr. 463, 464).

On May 4, 2011, Hyer was distraught that her stepfather had a stroke and was in the hospital. (Tr. 551). Chatterton noted that Hyer's mood ranged from tears to the statement "I know

---

[2]    Hyer had three appointments with Chatterton in May 2011, and then, for the remainder of the year, resumed having only one or two appointments a month. (Tr. 550-51, 556). In 2012 and 2013, Hyer usually met with Chatterton once a month. (Tr. 344-45, 620-22). There were a few exceptions. She had three appointments in January 2012, two appointments in March 2012, no appointments in February 2013, and two appointments in May 2013. (Tr. 342-44, 550, 621-22). In her mental impairment statement, Chatterton stated that she had seen Hyer 37 times since November 4, 2008, meaning Hyer averaged about one appointment per month over the entire course of treatment. (Tr. 558).

everything will be fine." (*Id.*). The following week, on May 12, 2011, Hyer reported that she was sleeping for long periods during the day and having difficulty with motivation and self-care. (*Id.*).

On June 27, 2011, Hyer was feeling "not too depressed," and experiencing "occasional bouts of feeling down." (Tr. 462). She also told Chatterton that she was about to go on a trip to Maine to pick up her fiancé's teenage daughters. (*Id.*). In July 2011, Hyer was "doing ok." (Tr. 461). She was experiencing increased tension with her fiancé's adolescent daughters. (Tr. 556). In August 2011, Hyer was feeling "good, a little cranky, [and] a little frustrated financially." (Tr. 460).

In September 2011, Hyer was very upset that her fiancé left her, choosing "his kids over her." (Tr. 459, 556). They had "ended the relationship because her fiancé wanted his youngest daughter to live with them and she thought that this would be a source of conflict." (Tr. 489). Hyer said she had no motivation at all, but also reported that she was participating in a "girls' weekend" in October. (Tr. 459). In October 2011, Hyer was trying to go out on dates to get over the break-up. (Tr. 458). She continued to have no motivation and told Chatterton that it was an effort to do anything except date. (*Id.*). In the beginning of November 2011, Hyer was less depressed regarding her recent break-up, but exhibiting some impulsivity around dating and trying to find another boyfriend. (Tr. 550). Chatterton recommended that Hyer "allow room to resolve feelings about loss [of a] relationship before entering into a new relationship." (*Id.*).

In December 2011, Hyer was upset that her social security application was rejected "again." (*Id.*). Chatterton noted that she would work with Hyer on trying to develop a return to work plan, but Hyer was "highly resistant to this." (*Id.*). Hyer felt she could not be reliable to an employer. (*Id.*). Hyer was despondent about the upcoming holiday and concerned she would have

5

to move back home to live with her mother. (*Id.*). She was having "a lot of bad days" and needed assistance with shopping and cleaning. (Tr. 544).

In the beginning of January 2012, Hyer was still grieving the loss of her relationship. (Tr. 550). She stayed with her mother the week of Christmas and New Years and it did not improve her mood. (*Id.*). At the end of January 2012, Hyer reported that her depression had increased and her appetite has decreased. (Tr. 622). She had lost 44 pounds since she discontinued Depakote, and acknowledged that she needed to lose more weight, but had no motivation to modify her self-care. (*Id.*). On February 9, 2012, Hyer reported meeting with her ex-fiancé in an attempt to bring closure to their relationship. (Tr. 622). She presented as flat and low energy, but her thought process was logical and goal directed. (*Id.*).

In the beginning of March 2012, Hyer reported that her panic attacks stopped, but she still had racing thoughts. (Tr. 621). At the end of March 2012, Hyer was actively dating again, and an increase to one of her medications had improved her mood a "little bit." (*Id.*). In April 2012, Hyer said she was not sleeping well, and had a lot of thoughts at once. (Tr. 621, 628). Dr. Kalkstein had prescribed medication to help her sleep which Hyer had not yet picked up. (Tr. 621). Chatterton encouraged her to do so. (*Id.*). Because Hyer was engaging in a "great deal of Internet dating," Chatterton made a note to work with Hyer on being less impulsive with meeting new people. (*Id.*).

In May 2012, Hyer had a visit with her father that "went well." (Tr. 620). She also saw her adult daughter and was experiencing self-loathing around being a "bad mother." (*Id.*). In June 2012, Hyer's mood had "stabilized better," and she experienced a decrease in racing thoughts and a decrease in anxiety that lasted "several weeks." (*Id.*). Chatterton noted that Hyer presented as "much less anxious." (*Id.*). In July 2012, Hyer's stepfather passed away, and she was very upset

6

and worried about her mother. (*Id.*). Chatterton noted that Hyer was sad about the loss, but more upset than usual because her stepfather has been chronically ill for a long period.[3] (*Id.*).

In August 2012, Hyer went on vacation with her father, stepmother, and brother. (Tr. 619). In September 2012, Hyer reported several panic attacks she attributed to judging herself against her siblings. (*Id.*). In October 2012, Hyer presented as "somewhat depressed and agitated." (Tr. 345). Hyer reported that her mood was "o.k," but she was struggling with impulsivity around texting and calling the men she was dating. (*Id.*). Hyer was also concerned that about statements from her father about selling her condominium. (*Id.*).

In November 2012, Hyer went to California with her mother to visit her sister.[4] (Tr. 344). Hyer found that traveling with her mother was not very stressful. (*Id.*). She had some mood swings but no evidence of manic or depressive episodes. (*Id.*). In December 2012, Hyer reported that she was not sleeping well and feeling sad about being alone at Christmas. (Tr. 344). Hyer did have plans, however, to spend Christmas with her mother. (*Id.*). On December 27, 2012, Hyer reported that she had started walking with the ladies in her building three times a week. (Tr. 640). Her mood was fair and depression mild. (*Id.*).

In February and March 2013, Hyer was very upset that her mother was dating. (Tr. 343-44). Chatterton noted that she would work with Hyer on the reality of her mother moving on with her life after the death of her stepfather. (Tr. 344). In March 2013, Hyer also reported that her energy had been "o.k." and she was going for "AM walks" with her neighbors. (*Id.*).

---

[3]    Chatterton used the words "not increase upset," which the court interprets as not more upset than usual.

[4]    At the hearing, Hyer's counsel made a point to explain that the trip to California did not involve "touristy things." (Tr. 60). Counsel explained that if Hyer had not gone with her mother, she would have been alone, which was an unacceptable situation for her, because she has so much help from her mother. (*Id.*). No similar explanations were offered for the several other trips Hyer took from 2010 to 2013.

In April and May 2013, Hyer repeatedly reported feeling very upset, because her father was selling her condo, and she had to move. (Tr. 343). Her mother was helping her find an apartment. (*Id.*). In late May 2013, Hyer noticed that her estranged daughter was on Facebook. (Tr. 342). Chatterton noted that Hyer was confident about what to do in this situation, but had, in fact, done nothing about contacting her daughter. (*Id.*). Chatterton planned to work with Hyer on finding ways to reestablish contact and start on a process of reconciliation. (Tr. 342).

In June 2013, Hyer visited her friends in New Jersey for a wedding. (Tr. 342). She had some conflicts with the groom's mother that caused anxiety but she enjoyed the wedding. (*Id.*). In the last treatment note from Chatterton, Hyer reported that her condo had sold and she did not have a place to move to yet. (*Id.*). Hyer was feeling very stressful and her mother was helping her. (*Id.*).

### D.    Medical Opinions

#### 1.    Joan Chatterton, RN, LCSW

Chatterton completed two mental impairment statements. (Tr. 558-61, 633-34). In the first statement, dated January 26, 2012, she diagnosed Hyer with bipolar disorder, and identified the following symptoms: poor memory, appetite disturbance with weight change, sleep disturbance, constant emotional changes, anhedonia or pervasive loss of interests, social withdrawal or isolation, and decreased energy. (Tr. 558). Chatterton noted the following environmental stressors: unemployment, inadequate finances, and inadequate social support. (*Id.*). She also noted that Hyer's medications "have stabilized her mood swings," but left her with side effects including increased lethargy, slowed cognitive processing, and difficulty finding words. (Tr. 559-

60).  She assessed a GAF score of 55 currently and a high of 59 for the past year, indicating moderate symptoms.[5]   (Tr. 558).

Chatterton opined that Hyer would have difficulty working at a regular job on a sustained basis and be absent from work about twice a month, because she frequently isolated herself at home and cancels outside appointments. (Tr. 560). According to Chatterton, "this behavior may be problematic for an employer that requires consistent reliable attendance." (*Id.*). Finally, Chatterton opined that Hyer had: moderate limitations in activities of daily living; moderate difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence, or pace; and three or more episodes of decompensation in work or work-like settings which caused the individual to withdraw from that situation. (Tr. 561).

On July 15, 2013, Chatterton completed a second statement. (Tr. 633-34).  This time Chatterton stated that Hyer was experiencing no side effects from medications. (Tr. 635). In addition, Chatterton noted that she could not determine how many days Hyer would miss work due to her impairments, because Hyer had not been employed during her time of treatment. (Tr. 635). But Chatterton again opined that Hyer would have difficulty working at a regular job on a sustained basis. (*Id.*). When asked to explain why, Chatterton relied on Hyer, stating "patient verbalizes she would have difficulty in regular employment due to her mood shifts and difficulties with consistency and concentration." (*Id.*).

Finally, Chatterton opined that Hyer's functional limitations in activities of daily living and social functioning had increased from moderate to marked. (Tr. 636).  Hyer's deficiencies of

---

[5]      A GAF score is a global assessment of functioning.  A score between 51 of 60 means moderate symptoms (e.g., occasional panic attacks) or moderate difficulty in social functions (e.g. few friends, conflicts with peers or co-workers).  A score between 61 and 70 means mild symptoms or some difficulty in social functioning, but generally functioning pretty well. http://www.albany.edu/counseling_center/docs/GAF.pdf (last visited September 19, 2016).

concentration, persistence, or pace remained frequent, and her episodes of decompensation in work or work-like settings remained at three or more. (Tr. 636). Meanwhile, her current GAF score had improved to 60 currently and a high of 70 for the year, indicating moderate to mild symptoms. (Tr. 633).

### 2.    David Kalkstein, MD

On March 8, 2012, Dr. Kalkstein completed the Psychiatric Review Technique, a check-box form. (Tr. 589-602). He indicated that Hyer's medical disposition met listing 12.04 for affective disorders. (Tr. 589). He also indicated that Hyer had bipolar syndrome with periods of both manic and depressive symptoms. (Tr. 592). Finally, Dr. Kalkstein opined that Hyer had extreme functional limitations in activities of daily living; extreme limitations in social functioning; extreme limitations in concentration, persistence, or pace; and four or more episodes of decompensation, each of extended duration. (Tr. 599).

On June 27, 2013, Dr. Kalkstein completed a medical source statement. (Tr. 629-32). Like Chatterton, he diagnosed Hyer as having bipolar disorder with generally the same symptoms. (Tr. 629-30). Dr. Kalkstein noted that Hyer's treatment had "achieved [an] optimal level," but she continued to experience "social isolation." (Tr. 630). He also noted that Hyer had a "reasonable response" to treatment with medication, but continued to have "poor functioning." (Tr. 630). He assessed a current GAF score of 40 currently and a high of 40 for the year, which indicates some impairment in reality testing or communication, or major impairment in several areas, such as work, family relations, judgment thinking or mood. (Tr. 37, 633).

Dr. Kalkstein opined that Hyer would be absent from work more than three times a month because she "doesn't even function at home." (Tr. 631). In addition, he opined that Hyer had: marked limitations in activities of daily living; marked difficulties in maintaining social

10

functioning; frequent deficiencies of concentration, persistence, or pace; and four or more episodes of decompensation in work or work-like settings. (Tr. 561).

### 3.    Andrew Donohue, D.O.

On November 14, 2011, Andrew Donohue, D.O., conducted a consultative examinatin at the state agency's request. (Tr. 489-94). Hyer's appearance was fairly neat. (Tr. 492). She described her mood as "okay," a 5 out of 10, with 10 being the best. (Tr. 493). Hyer reported that she was not motivated to take part in any type of social activities. (Tr. 489). Her primary social support came from her mother, father, stepmother, stepfather, siblings and girlfriends. (*Id.*). She "ordered out" most meals and rarely would prepare anything more complicated than cereal. (Tr. 490). She indicated that she generally got along well with others, but sometimes became frustrated at work. (*Id.*). When asked how her psychiatric illness affected her ability to work, Hyer said she had "a problem with absenteeism" and difficulty "dragging myself out of bed." (*Id.*).

On cognitive testing, Hyer did "fairly well," scoring 29 out of 30 in the Mini-Mental State Examination. (Tr. 493). A score of 23 or lower is indicative of cognitive impairment, whereas a score of 24 or higher is in the normal range.[6] Dr. Donohue assessed a GAF score of 55, indicating moderate symptoms. (Tr. 493). In his conclusions, Dr. Donohue noted that although Hyer described difficulty maintaining employment due to her affect and anxiety conditions, she had a fairly long history of employment at various facilities. (*Id.*). Finally, Dr. Donohue noted that Hyer was "fairly intelligent, articulate, [and] able to maintain at least minimal activities of daily living." (*Id.*).

---

[6]    https://www.mountsinai.on.ca/care/psych/on-call-resources/on-call-resources/mmse.pdf (last visited Sept. 16, 2016)

4.    State Agency Reviews

On December 1, 2011, state agency clinical psychologist Carlene Tucker-Okine, Ph.D,

reviewed Hyer's records and completed a psychological review technique assessment. (Tr. 127-

28). Dr. Tucker-Okine opined that Hyer had mild restrictions in daily living activities; mild

difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and

one or two episodes of extended-duration decompensation. (Tr. 128). Dr. Tucker-Okine also

completed a mental residual functional capacity assessment, in which she concluded that Hyer was

not significantly limited in carrying out short and simple instructions, moderately limited in

carrying out detailed instructions, moderately limited in maintaining concentration for extended

periods, and not limited in social interaction. (Tr. 131).

Dr. Tucker-Okine explained that, despite Hyer's subjective complaints, Hyer's records

showed that her thinking was logical and goal-directed, intelligence was average, memory was

intact, speech was coherent, and social and interpersonal skills were limited, but appropriate. (Tr.

131-32). Dr. Tucker-Okine also noted that Hyer had a positive response to treatment and

medication; she only decompensated when faced with a significant life stressor, such as the break-

up with her fiancé and her daughter going into rehab. (Tr. 132). Upon Hyer's reconsideration

request, Maurice Prout, Ph.D. reached the same conclusions as Dr. Tucker-Okine. (Tr. 163-65).

E.    Hyer's Testimony

Hyer stopped working in 2009, because her boss let her go for underperforming. (Tr. 66,

489). Afterwards, she filed for and collected unemployment benefits. (Tr. 66). Around the same

time, she also filed an application for disability insurance benefits. (Tr. 67). Hyer testified that

she would like to get back to work, but "the type of work I'm qualified for would be very stressful

to me." (Tr. 67). She missed work "a lot" because she was "out sick" or "took vacation a lot."

(*Id.*). When asked what kind of sickness, Hyer responded "headaches, fatigue," and "there were times I couldn't even get out bed." (Tr. 67).

Hyer also testified regarding her social interactions. She "mostly" wants to be away from people and she "rarely" goes out, but she visits her father in North Carolina and sees her two friends once or twice per month. (Tr. 70-71). She goes out to eat and "sometimes" meets up with her friends for "lunch or something." (Tr. 82). She also volunteers at her church twice per month answering the telephone. (Tr. 83). She stated that she has only two or three "bad days" per week. (Tr. 85).

Finally, Hyer testified regarding her activities of daily living. She lives alone and makes herself simple meals. (Tr. 31). She does no household chores; her mother comes over and helps. (*Id.*). She can make the bed or change sheets. (*Id.*). She does not always do her laundry. (*Id.*). She lets it pile up and takes it to her mother to do. (*Id.*). Her mother helps with grocery shopping because the she feels overwhelmed. (*Id.*). She can run simple errands, such as go to the doctors' office or drug store. (*Id.*). Some of Hyer's testimony was consistent with a function report she completed and some of Hyer's testimony claimed that her daily activities were more restricted than what was represented in the report. In the function report, Hyer indicated that she prepares her own meals "most of the time," and cooks food, such as a "simple pot roast," two or three times per week. (Tr. 284). She does housework "every few days" for "most of the day." (Tr. 284). She can drive a car and go out alone, depending upon how she feels. (Tr. 285). She goes food and clothes shopping in stores. (Tr. 285). For hobbies, she watches television, frequently reads, does flower arrangements, and makes beaded jewelry. (Tr. 286, 327).

**F.     ALJ's Decision**

Under the Social Security Act, the ALJ employs a sequential five-step evaluation process to determine whether a claimant is disabled. At step one, the ALJ considers whether the claimant is currently engaged in substantial gainful activity, and if not proceeds to the next step. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). At step two, the ALJ considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. *Id.* If the claimant suffers a severe impairment, the ALJ considers at step three whether the impairment meets the criteria in the listing of impairments, 20 C.F.R. pt. 404, subpt. P, app. 1 (1999). If the impairment does not meet the criteria for a listed impairment, then the ALJ considers at step four whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work. *Sykes*, 228 F.3d at 263. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform. *Id.* At steps two and three, limitations in four functional areas are used to determine the severity of a claimant's mental impairment. SSR 96–8p, 1996 WL 374184, at *4. These areas, sometimes referred to as the Paragraph B criteria, include activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decomposition. 20 C.F.R. § 404, Subpt. P, App. 1, at § 12.00(C).

Here, the ALJ determined that Hyer had not engaged in substantial gainful activity since November 9, 2010. (Tr. 30). Hyer had severe impairments of obesity, depression, and anxiety, but the impairments did not meet or equal the criteria of any of the listed impairments. (Tr. 30-31). The ALJ found that Hyer had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except postural activities are limited to occasional, and she is limited to simple, unskilled work, defined as work not at a production pace. (Tr. 33). Based upon the

14

vocational expert's testimony, the ALJ concluded that Hyer was capable of making a vocational adjustment to a significant number of unskilled, sedentary jobs in the national economy, including work as an addresser, order clerk, and call out operator. (Tr. 38.). Therefore, Hyer was not disabled from November 9, 2010 through August 27, 2013. (Tr. 39).

## III.   STANDARD OF REVIEW

A reviewing court will reverse the ALJ's decision only if the ALJ did not apply the proper legal standards or if the decision was not supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). If the ALJ's findings of fact are supported by substantial evidence, the court is bound by those findings even if it would have decided the case differently. *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Evidence is considered "substantial" if it is less than a preponderance but more than a mere scintilla. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the decision, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.   DISCUSSION

Hyer raises three arguments on appeal. First, according to Hyer, the ALJ erred in giving little weight to the opinions of her treating psychiatrist and therapist. (D.I. 12 at 10-18). Second,

15

the ALJ failed to consider the type, dosage, and effectiveness of Hyer's medications in assessing her credibility. (*Id.* at 18-19). Finally, the RFC failed to take into account the ALJ's own findings under the Paragraph B criteria considered at step three that Hyer had moderate limitations in social functioning and moderate limitations in concentration, persistence, and pace. (*Id.* at 19-21). Each of these arguments will be addressed in turn.

### A.   Weight of Dr. Kalkstein's Opinions

Hyer claims that the ALJ erred in giving little weight to the opinion of her treating psychiatrist, Dr. Kalkstein.[7]   (D.I. 12 at 10-18).   The opinion of a treating psychiatrist is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).   However, an ALJ is entitled to disregard a treating psychiatrist's opinion when it is "conclusory, lacking explanation, and inconsistent with other medical evidence in the record." *Griffin v. Comm'r Soc. Sec.*, 305 F. App'x 886, 891 (3d Cir. 2009); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (stating that where there is contradictory evidence, an ALJ may reject the opinion of the treating physician outright, or may accord it more or less weight depending on the extent to which it is supported).   The court finds that the ALJ appropriately gave little weight to Dr. Kalkstein's opinion, because substantial evidence in the record was inconsistent with his conclusions that Hyer had marked or extreme limitations in the four functional areas used to determine the severity of a claimant's impairment.

---

[7]     As a part of this argument, Hyer makes the conclusory assertion, without citation to any authority, that the ALJ erred in giving any weight to opinions of the state agency consultants Carlene Tucker-Okine, PhD and Maurice Prout, PhD, because their medical credentials and expertise were not a part of the record.   (D.I. 12 at 15-16; D.I. 16 at 5-6).   Hyer provided no authority in support of this argument. Thus, the court will not consider the argument. *McAllister v. Chater*, 1997 WL 162356, at *13 (D. Del. 1997) (declining to address the ALJ's findings where the plaintiff cited no authority as to why it was improper).

First, there is substantial evidence that seems to contradict Dr. Kalkstein's opinion that Hyer experienced continued social isolation demonstrating a marked or extreme limitation in social functioning. (Tr. 630). Hyer identified several people as providing a primary support system, including family and "close" friends.[8] (Tr. 359, 489). Treatment notes show that she periodically spent time with her primary support system, as well as others. (Tr. 359, 489). She traveled frequently to see family out of state, went on a "vacation" with them, saw her mother once a week, had a weekend "girls getaway," attended a wedding, met friends for lunch once or twice a month, took walks with her neighbors three times a week, dated, and volunteered at her church answering telephones about two times per month.[9] (Tr. 37, 342, 344, 444, 455-59, 462, 619-21, 640). Moreover, there is evidence that these experiences had some positive attributes. A trip to see her father "went well," another trip with her mother was not very stressful, and she "enjoyed" the wedding. (Tr. 342, 344, 620).

Second, there is substantial evidence that seems to contradict Dr. Kalkstein's opinion that Hyer had marked or extreme limitations in activities of daily living. (Tr. 630). Hyer claims that she must rely on her mother to shop and clean (D.I. 12 at 13), but Hyer herself reported that she has, at times, performed these activities on her own. (*See, e.g.*, Tr. 284-85 (reporting that she cooks simple meals, such as a pot roast, two or three times per week and does housework "every few days")). During the hearing, Hyer testified that she sometimes does not shower for three days. (Tr. 74). She did appear fairly well groomed at both the hearing and a consultative mental

---

[8]    Hyer reported that her fiancé had also been "very supportive." (Tr. 359). They were together for almost a year after the onset date on November 9, 2010. (Tr. 489).

[9]    Hyer claims that her internet dating was actually a symptom of her impairment, because it demonstrated impulsive behavior. (D.I. 12 at 12-13; D.I. 16 at 3). Even if that were true, which remains uncertain, the dating is just one example among many other healthy social interactions demonstrating the Hyer was not as socially isolated as Dr. Kalkstein opined.

examination. (*Id.*; 492). As the ALJ noted, the fact that Hyer's symptoms were variable, meaning she sometimes engaged in activities of daily living and sometimes did not, was inconsistent with a marked or extreme limitation in activities of daily living. (Tr. 31, 32).

Third, Dr. Kalkstein's opinion that Hyer had marked (or frequent) limitations in concentration, persistence, and pace was inconsistent with substantial evidence that Hyer was intact cognitively, and presented as fairly intelligent and articulate. (Tr. 32). Hyer scored 29 out of 30 on a Mini-Mental State Examination. (Tr. 493). In an independent psychiatric evaluation, Dr. Donohue found Hyer to be "fairly intelligent" and "articulate." (Tr. 439). Similarly, in a mental status examination during her stay at Christiana Care, the doctors found Hyer to have logical and coherent thought processes, intact memory and cognitive abilities, and "roughly average" intellect. (Tr. 382). Hyer testified that she had difficulty with concentration and memory. (Tr. 34). But, she writes things down, and is able to take her medication on her own. (*Id.*).

Fourth, the ALJ correctly noted that there is evidence of only one episode of decompensation since the alleged onset date, not three or four, as Dr. Kalkstein opined. (Tr. 32, 558, 633, 632). Episodes of decompensation are exacerbations of symptoms accompanied by a loss of adaptive functioning that ordinarily require a more structured psychological support system such as hospitalizations or placement in a halfway house.[10] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. There is only one incident in the record where Hyer had to spend time in a structured setting to cope with an exacerbation of her symptoms. She admitted herself for five days to Christiana Care for inpatient mental health treatment when she was experiencing suicidal thoughts. (Tr. 359-67).

---

[10]     To meet or equal the Medical Listings, the "repeated" episodes of decompensation must be of "an extended duration," meaning the claimant experienced three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Hyer would not be able to show that she satisfied this particular criteria in the Medical Listings.

There are no subsequent reports of suicidal thoughts and no subsequent inpatient treatment for psychiatric care. (Tr. 86-87). In addition, after her discharge from Christiana Care, Hyer did not participate in out-patient group therapy, purportedly because she was going to instead increase the frequency of her appointments with her therapist and psychiatrist. (Tr. 355, 381). Hyer, however, had no appointments with Chatterton for six weeks following her discharge, and continued to average one appointment per month for the next few years. (Tr. 342-45, 550-58, 620-22).

Finally, Dr. Kalkstein's GAF score of 40 was inconsistent with the contemporaneous treatment notes often describing Hyer's symptoms as stable and improving. (Tr. 37). Dr. Kalkstein's notes document fairly stable symptoms with intermittent exacerbations focused around life-stressors, and then improvement with therapy and medications. Just a few visits after medication management of her symptoms started, Hyer reported that her mood was "a lot better" and she was "not depressed." (Tr. 446). There were other times when Hyer reported that she was feeling "good," had only "occasional bouts of feeling down," or that her depression was "mild." (Tr. 344, 460, 462). For several months, Hyer reported that she had no problems with mood swings. (Tr. 463-65). At one point she also reported that her panic attacks had stopped. (Tr. 621). The ALJ appropriately found that, although Hyer's symptoms were variable, the periods of stability and improvement were inconsistent with marked to extreme limitations. Accordingly, substantial evidence supports the ALJ's decision to give little weight to the opinion of Dr. Kalkstein.[11]

---

[11]     Because the ALJ did not err in giving little weight to Dr. Kalkstein's opinion, Hyer did not demonstrate, as she claims, that she met or equaled the criteria in Listing 12.04. (D.I. 12 at 10-11).

### B.     Weight of Chatterton's Opinions

Hyer claims that the ALJ erred in giving "little weight" to the opinion of her therapist, Chatterton.  (D.I. 12 at 10-18).  Licensed clinical social workers and registered nurses, like Chatterton, are not considered "acceptable medical sources" under the Social Security regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a).  Accordingly, their opinions "cannot establish the existence of a medically determinable impairment" and are not entitled to controlling weight.  SSR 06-03P, 2006 WL 2329939, *2 (2006).  Their opinions may be used, however, "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  *Id.*

As an initial matter, in one of her two opinions, Chatterton concluded, like Dr. Kalkstein, that Hyer had marked limitations in activities of daily living, social functioning, and concentration, persistence, and pace, and three or more episodes of decompensation. (Tr. 636).  That opinion was inconsistent with the substantial evidence in the record for all the same reasons given above with respect to Dr. Kalkstein's opinion.  The ALJ provided several additional reasons for giving both opinions of Chatterton little weight, which is the focus of this section.

As the ALJ noted, Chatterton's two opinions were inconsistent with each other.  (Tr. 33). The inconsistencies cannot be explained, as Hyer claims, by the fact that the opinions are dated over a year apart, and symptoms may worsen or improve with time.  (D.I. 16 at 6-7).  According to Chatterton, the functional limitations on Hyer's activities of daily living and social functioning increased from moderate to marked.  (Compare Tr. 561, 636).  Meanwhile, however, Chatterton opined that Hyer's GAF score improved from 55/59 to 60/70.  (Compare Tr. 558, 633).  In other words, Chatterton opined that Hyer's functional assessment had simultaneously improved and worsened.

20

There are other inconsistencies that support the ALJ's assessment of Chatterton's two opinions. For example, Chatterton assessed a GAF score of 55/59, which represents moderate symptoms of functional limitation, but opined that Hyer's symptoms were marked. (Tr. 37, 636). Similarly, in the first Medical Source Statement, Chatterton opined that Hyer would be absent from work about twice a month, but in the second Medical Source Statement said she was unable to assess whether Hyer would be absent, because Hyer had not been employed during her period of treatment. (Compare Tr. 560, 636). Meanwhile, however, Chatterton was comfortable asserting in both statements that Hyer had three or more "episodes of deterioration or decompensation *in work or work-like settings*." (Tr. 561, 635 (emphasis added)). In addition, Chatterton did not cite her own independent clinical findings as support for her assessment that Hyer would have difficulty working on a sustained basis. (See Tr. 635). She instead relied on the fact that Hyer herself "verbalized" that she would have difficulty in regular employment due to mood shifts and difficulties with consistency and concentration. (*Id.*). For all of these reasons, the ALJ did not err in giving Chatterton's opinion little weight.

### C.   Hyer's Medications

In her opening brief, Hyer made a conclusory one-sentence argument that the ALJ "did not adequately consider the type, dosage, and effectiveness of her medications in assessing her credibility." (D.I. 12 at 18). Hyer cited no authority showing that the ALJ committed reversible error in the manner in which she addressed Hyer's medications. The only authority Hyer cited was 20 C.F.R. 404.1529(c)(3) and its corollary 416.929(c)(3)(iv). These regulations provide that a claimant's medication is one of seven factors the ALJ will evaluate to determine the intensity and persistence of a claimant's symptoms. (D.I. 12 at 18). Hyer admits, however, that the ALJ

did, in fact, consider the effects of Hyer's medications on her symptoms.[12] Hyer does not explain how this consideration was inadequate.

"It is not enough merely to present an argument in the skimpiest way, and leave the Court to do counsel's work-framing the argument, and putting flesh on its bones through a discussion of the applicable law and facts." *Ve Thi Nguyen v. Colvin*, 2014 WL 1871054, at *2 (W.D. Wash. May 8, 2014). Accordingly, this argument fails. *See, e.g., Stewart v. Colvin*, 640 Fed. Appx. 777, 781 (10th Cir. 2016) (waiving argument due to inadequate briefing in opening brief); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting conclusory assertion that ALJ erred when claimant provided no analysis of relevant law or facts regarding purported error); *Perez v. Barnhart*, 415 F.3d 457, 462 n. 4 (5th Cir. 2005) (argument waived by inadequate briefing); *Kenny v. Colvin*, 2016 WL 1369592, at *5 (W.D. Tex. Apr. 6, 2016) (finding a waiver of argument because of no citation to authority and inadequate briefing).[13]

### D.     Residual Functional Capacity

Finally, Hyer claims that the ALJ's RFC analysis was defective because it was based on a hypothetical question that failed to include all of the Hyer's credibly established limitations. (D.I. 12 at 19-21). Specifically, Hyer claims that the RFC formulated at step four of the sequential

---

[12]     For example, the ALJ discussed: Hyer's testimony that even with medication, her symptoms feel the same; Dr. Kalkstein's notes showing that a few visits after starting medication management, Hyer's mood was a lot better and she was not depressed; Dr. Kalkstein's notes showing that he adjusted Hyer's medications to address her varying symptoms; Hyer's report on one occasion that medication changes were somewhat helpful; and Hyer's report on another occasion that, with a medication adjustment, "her mood stabilized and was better with reduced racing thoughts." (Tr. 34-36). Accordingly, the ALJ concluded that Hyer had "intermittent improvement in her symptoms with therapy and medications." (Tr. 35).

[13]     Hyer's citation in her reply brief to *Hall v. Astrue*, 2014 WL 348591, at *1 n. 1 (E.D. Pa. Jan. 31, 2014) is of no assistance, not only because it was a cite with no explanatory parenthetical and not in the opening brief, but also because it is legally and factually inapposite. The legal issue in that case was not credibility and, unlike here, the ALJ completely failed to mention the claimant's medication. 2014 WL 348591, at *1 n. 1.

evaluation failed to take into account the ALJ's own findings at step three that Hyer had moderate limitations in concentration, persistence, and pace and moderate limitations in social functioning. The Third Circuit has held that a hypothetical posed to a vocational expert must include "all of the claimant's credibly established limitations, but does not require that the vocational expert be apprised of limitations which have been determined not to affect the claimant's RFC." *Covone v. Comm'r Soc. Sec.*, 142 Fed. Appx. 585, 587 (3d Cir. 2005).

Here, in formulating the RFC, the ALJ relied on a hypothetical question limiting Hyer to sedentary work that was "simple, unskilled work … not at a production pace." (Tr. 33, 95). As case law has repeatedly demonstrated, this hypothetical question adequately accounts for Hyer's moderate limitations in concentration, persistence, and pace. *See, e.g., Bacon v. Colvin*, 2016 WL 556727, at *10 (D. Del. Feb. 12, 2016) ("non-production pace" adequately captures a claimant's moderate difficulties in concentration, persistence, and pace); *Russo v. Astrue*, 421 Fed. Appx. 184, 192 (3d Cir. 2011) (having no quota to fulfill accounts for moderate difficulties in concentration, persistence, and pace); *McDonald v. Astrue*, 293 Fed. Appx. 941, 946 (3d Cir. 2008) ("simple routine tasks" accurately conveyed moderate limitations in concentration, persistence, and pace); *Padilla v. Astrue*, 2011 WL 6303248, at *10 (D.N.J. Dec.15, 2011) ("simple, unskilled work" accounts for moderate limitations in concentration, persistence or pace).[14]

---

[14]    Hyer cites three cases regarding concentration, persistence, and pace that are all distinguishable. (D.I. 12 at 19-21). In *Weinsteiger v. Astrue*, 2010 WL 331903 (E.D. Pa. Jan. 25, 2010) and *Plank v. Colvin*, 2013 WL 6388486 (E.D. Pa. Dec. 6, 2013), the hypotheticals mentioned "simple" or "unskilled" work, but, unlike here, did not mention a "non-production pace." In the third case, *Solomon v. Colvin*, 2013 WL 5720302 (D. Del. Oct. 22, 2013), the court never disclosed the ALJ's findings as to the plaintiff's functional limitations in concentration, persistence, and pace. Unless the plaintiff in that case, like the plaintiff in this case, had moderate limitations in concentration, persistence, and pace, the holding in that case cannot be compared to this case. Accordingly, *Solomon* is unpersuasive.

Hyer provided no citations for her assertion that the ALJ committed reversible error by failing to include restrictions in the hypothetical questions that encompass her moderate limitations in social functioning. (*See* D.I. 12 at 19-21). For this reason alone, this argument should fail. *See, e.g., Kenny v. Colvin*, 2016 WL 1369592, at *5 (W.D. Tex. Apr. 6, 2016) (finding a waiver of argument because of no citation to authority and inadequate briefing). Nevertheless, the court notes the diverging approaches to this argument when it is appropriately raised, and finds that the ALJ did not err in formulating her RFC.

Some courts have concluded that an ALJ is under no obligation to include limitations in the RFC reflecting a plaintiff's moderate limitations in social functioning, because the Paragraph B criteria considered at step three "does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment" determined at step four. *Beasley v. Colvin*, 520 Fed. Appx. 748, 754 (10th Cir. 2013); *Bing v. Comm'r of Soc. Sec.*, 2016 WL 4410796, at *3 (W.D. Mich. Aug. 18, 2016) (finding that ALJ was not required to explicitly address a step three determination that plaintiff had moderate limitations in social functioning at the step four determination as to plaintiff's residual functional capacity); *Race v. Comm'r of Soc. Sec.*, 2016 WL 3511779, at *5 (N.D.N.Y. May 24, 2016) (stating that "the ALJ did not err in failing to explicitly account for social functioning limitations in his mental RFC determination where he found Plaintiff had 'moderate' limitations in social functioning at step three because an analysis at steps two and three are not an RFC analysis"); *Taylor v. Colvin*, 2016 WL 760399, at *13 (N.D. Ohio Feb. 26, 2016) (holding that ALJ did not err in failing to include specific limitations relating to plaintiff's social functioning in his RFC even though he found moderate limitations in social functioning in his paragraph B criteria at Steps 2 and 3 because "it is well established that the paragraph B criteria used at steps 2 and 3 of the sequential analysis is 'not an RFC assessment'"

24

(quoting SSR 96–8p 1996 WL 374184, at *4)); *Lupold v. Comm'r of Soc. Sec.*, 2014 WL 3809494, at *8 (D.N.J. July 31, 2014) (rejecting argument that ALJ had to include restrictions related to plaintiff's moderate limitations in social functioning in RFC, because not every limitation affects the RFC of a claimant).

Other courts, without questioning whether the step four RFC determination must include all of the limitations related to the step three Paragraph B criteria, have held that an RFC accurately encompassed a plaintiff's moderate limitations in social functioning when the plaintiff was limited to "occasional" or "superficial" contact with supervisors, co-workers, or the public. *See, e.g.*, *Washington v. Soc. Sec. Admin.*, 503 Fed. Appx. 881, 883 (11th Cir. 2013) (holding that ALJ accounted for plaintiff's moderate limitations in social functioning by limiting plaintiff to jobs that involved "only occasional interaction with the general public and coworkers"); *Seamon v. Astrue*, 364 Fed. Appx. 243, 248 (7th Cir. 2010) (finding that ALJ accounted for plaintiff's moderate limitation in social functioning by restricting her to "brief and superficial contact with others"); *Petty v. Colvin*, 2016 WL 4594225, at *1 (D.D.C. Sept. 2, 2016) (finding that RFC adequately accounted for moderate limitations in social functioning by requiring "only superficial contact with others"); *Pidgeon v. Colvin*, 2016 WL 2647666, at *13 (D.N.J. May 9, 2016) (finding that RFC sufficiently encompassed moderate difficulties in social functioning where it required "occasional interaction with coworkers, supervisors, and the public"); *McCarthy v. Colvin*, 2014 WL 7336764, at *12 (D.N.J. Dec. 19, 2014) (limiting individual to only occasional interaction with supervisors and co-workers, and no interaction with the general public, accurately portrayed plaintiff's moderate limitations in social functioning). Hyer's counsel elicited testimony from the vocational expert that all of the jobs he identified would permit "less than occasional" contact with a

25

supervisor. (Tr. 97). There was no testimony regarding the amount of contact Hyer would have with the public.

The court finds that there is some danger in reflexively conflating the Paragraph B findings at step three with the RFC determination at step four. As Social Security Regulations warn, the mental RFC assessment used at steps four "requires a more detailed assessment" than the criteria used in Paragraph B at step three. Here, a more detailed assessment would show that Hyer's treating psychiatrist, Dr. Kalkstein, opined that she had extreme limitations in social functioning due to her "social isolation." (Tr. 630). If the court were to find that the ALJ erred by not limiting Hyer to jobs that had only occasional contact with supervisors or the general public, it would be reinforcing the very situation that purportedly contributes to her mental impairments. Moreover, it would ignore evidence that Hyer generally got along well with others. (Tr. 490). Accordingly, the court finds that the ALJ did not err in formulating an RFC that did not limit Hyer to only occasional contact with supervisors, co-workers, and the public. The ALJ appropriately accounted for Hyer's mental impairments that would have an effect on her work capacity by limiting her to simple, unskilled work not at a production pace that accommodated less than occasional contact with her supervisors.

## V.    CONCLUSION

For the foregoing reasons, (1) Hyer's motion for summary judgment (D.I. 11) is denied; and (2) the Commissioner's motion for summary judgment (D.I. 13) is granted. An appropriate order will be entered.

Dated: September 29, 2016

UNITED STATES DISTRICT JUDGE